<u>NOT FOR PUBLICATION</u>                                  (Docket Entry No. 9)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| GARY BURICK, | : |
| Plaintiff, | : Civil No. 04-362 (RBK) |
| v. | : **OPINION** |
| CEMENT MASONS LOCAL 699 PENSION PLAN, and its BOARD OF TRUSTEES, | : |
| Defendants. | : |

**KUGLER**, United States District Judge:

      Plaintiff Gary Burick brought this civil action under the Employee Retirement Income Security Act ("ERISA")[1] against defendants Cement Masons Local 699 Pension Plan and its Board of Trustees to obtain disability pension benefits.  This matter comes before the Court upon the defendants' motion for summary judgment.  For the reasons expressed in this opinion, defendants' motion for summary judgment will be granted.

---

[1] Section 502(a)(1)(B) of ERISA empowers a participant in an employee benefits plan to bring a federal civil action to recover benefits due to him under the terms of the plan.  <u>See</u> 29 U.S.C. § 1132(a)(1)(B).

**I.      BACKGROUND**

    **A.     THE DEFENDANTS**

Defendant Cement Masons Local 699 Pension Plan (the "Plan") is a defined benefit plan that is subject to the provisions of the Employee Retirement Income Security Act ("ERISA"). Most employees covered by the Plan "work under the terms of collective bargaining agreements between the employers of such employees and Cement Masons Local 699 or its successor, Cement Masons Local 592." (Moskovitz Cert. Ex. D-4 at 00051.)

Defendant Board of Trustees ("Trustees") is responsible for the operation of the Plan. The Trustees, who interpret and make determinations under the Plan, are appointed in equal numbers by Local 592 and the employers who contribute money to fund the Plan. (Moskovitz Cert. Ex. D-4 at 00051.)

    **B.     PLAN FUNDING**

The Plan is funded by employers who have collective bargaining agreements with Local 592, by employers who have agreements directly with the Trustees, and by other pension plans through reciprocal agreements with the Plan. (Moskovitz Cert. Ex. D-4 at 00053.) The Plan provides that its assets "are to be used for the benefit of the participants, surviving spouses, and beneficiaries." (Id. at 00054; see id. Ex. D-3 at 00033.) "Under no circumstances may money which has been properly contributed to the Plan ever be returned to any employer or the

2

Union."  (Id. Ex. D-4 at 00054; see id. Ex. D-3 at 00034.)

### C.    DISABILITY PENSION BENEFITS UNDER THE PLAN

There are two Plan instruments relevant to this case: one adopted in 1995 (the "1995 Plan") and one adopted in 2001 (the "2001 Plan").  Both the 1995 Plan and the 2001 Plan entitle certain Plan participants to disability pension benefits.

#### 1.    Disability Benefits Under the 2001 Plan

A participant is "disabled" under the meaning of the 2001 Plan when that participant is entitled to Social Security disability benefits and does not work.  (Moskovitz Cert. Ex. D-4 at 00064.)  To obtain disability pension benefits under the 2001 Plan, a participant "must have been recently active in covered employment at the date [his] disability started."  (Id.)  The 2001 Plan defines "recently active in covered employment":

> Being "recently active in covered employment" means that when the accident (or condition) that caused your disability occurred (or started), you were not in a period of substantial gainful work outside a collective bargaining agreement between the Local 592 and an employer (or work covered by an agreement between your employer and the Plan Trustees) and, during the Plan Year in which you became disabled or in the immediately preceding Plan Year, you earned at least one-quarter of a year of Pension Service.

(Id. at 00065.)  The Plan defines "Pension Service" to mean employment "for which the employer is required to contribute to this Plan because the employer has entered a collective bargaining agreement with Local 592 (or another type of agreement

with the Trustees) that calls for this contribution." (<u>Id.</u> at 00056.)

### 2. Disability Benefits Under the 1995 Plan

A participant is "totally disabled" under the meaning of the 1995 Plan when that participant is entitled to Social Security disability benefits and does not work. (Moskovitz Cert. Ex. D-3 at 00011.) Under the 1995 Plan, a participant who "attains Disability Pension Date" after June 30, 1994 is entitled to disability benefits. (<u>Id.</u> at 00013.) "The Disability Pension Date for a participant who becomes totally disabled shall be the first day of the month following cessation of the participant's employment because of such total disability . . . ." (<u>Id.</u> at 00011.)

### D. TRUSTEES' DISCRETION UNDER THE PLAN

Under the 1995 Plan:

Notwithstanding any other provision of the Plan, the Trustees shall have exclusive authority and discretion to:

A. determine whether an individual is eligible for any benefits under the Plan;

B. determine the amount of benefits, if any, an individual is entitled to under the Plan;

C. interpret all of the provisions of the Plan; and

D. interpret all of the terms used in the Plan.

4

> All determinations and interpretations made by the Trustees, or their designee, pursuant to this Section shall be binding upon any individual claiming benefits under the Plan, be given deference in all courts of law, to the greatest extent allowed by applicable law, and not be overturned or set aside by any court of law unless such court determines that the Trustees have abused their discretion in rendering such determination or interpretation.

(Moskovitz Cert. Ex. D-3 at 0032.)  The 2001 Plan likewise gives the Trustees "exclusive authority and discretion" to determine eligibility for benefits and to interpret plan terms, and contains a similar provision as to deference in the courts.  (<u>Id.</u> Ex. D-4 at 0052.)

### E.   THE PLAINTIFF

Plaintiff Gary Burick is a participant in the Plan who suffered a back injury in 1993 while working in covered employment.  He last worked in covered employment in August 1993.  (<u>See</u> Defs.' Br. at 2.)

In October 2000, Burick filed an application for disability insurance benefits with the Social Security Administration.  That agency's Office of Hearings and Appeals held that Burick became "disabled" under the meaning of the Social Security Act on August 19, 1998.  (<u>See</u> Moskovitz Cert. Ex. D-8.)  Thus, Burick has been entitled to Social Security disability benefits since August 19, 1998.

**F.     PROCEDURAL HISTORY**

Burick made his first request for disability pension benefits under the Plan by telephone on December 17, 2002.  His request was denied by letter dated December 20, 2002, on the ground that he had not been "recently active in covered employment at the date [his] disability started," and thus did not satisfy the requirements of the 2001 Plan.  (Moskovitz Cert. Ex. D-6.)

Burick filed an appeal with the Trustees on January 30, 2003.  (Moskovitz Cert. Ex. D-1.)  The Trustees denied Burick's appeal by letter dated August 28, 2003, having determined that Burick was not eligible for a disability pension under either the 1995 Plan or the 2001 Plan.  (Id. Ex. D-12.)

The Trustees found that although Burick had been "totally disabled" since August 19, 1998, he had not worked in covered employment since August 1993.  (Id. at 00118.)  Based on this finding, the Trustees held that Burick: (1) was not entitled to benefits under the 1995 Plan because had not established "cessation of [his] employment because of [his] total disability," and (2) was not entitled to benefits under the 2001 Plan because he had not established that he was "recently active in covered employment at the time the disability started."  (Id. at 00118-19.)

Burick filed the instant ERISA action against the Plan

6

and the Trustees on January 28, 2004, arguing that the Plan's denial, through the Trustees, of his application for disability benefits was "arbitrary, capricious, and an abuse of discretion." (Compl. ¶ 16.)

II.     **ANALYSIS**

Summary judgment is only appropriate where a court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Celotex, 477 U.S. at 330.

A.     **STANDARD OF REVIEW**

Where a plan instrument gives its administrator discretionary authority to interpret plan terms and determine eligibility for benefits, the administrator's decision should be reviewed by a district court under an "arbitrary and capricious" standard. See Keating v. Whitmore Mfg. Co., 186 F.3d 418, 420-21 (3d Cir. 1999); Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439 (3d Cir. 1997). "A court reviewing a benefits denial under the

arbitrary and capricious standard must defer to the plan administrator unless the administrator's decision was without reason, unsupported by substantial evidence, or erroneous as a matter of law." Skretvedt v. E.I. DuPont de Nemours & Co., 268 F.3d 167, 174 (3d Cir. 2001).

"[S]tricter scrutiny . . . is in order" where the administrator operates under a "conflict of interest." See Kotrosits v. GATX Corp. Non-Contributory Pension Plan for Salaried Employees, 970 F.3d 1165, 1171-72 (3d Cir. 1992); see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Under this "sliding scale" approach to review under the "arbitrary and capricious" standard, district courts must "consider the nature and degree of apparent conflict with a view to shaping their arbitrary and capricious review of the benefits determinations of discretionary decisionmakers." See Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 393 (3d Cir. 2000).  The party who claims that a conflict of interest exists has the burden of establishing the conflict.  See Kotrosits, 970 F.2d at 1173.

Here, the parties agree that both the 1995 Plan and the 2001 Plan give broad discretion to the Trustees to interpret the terms of those plans and to determine eligibility for benefits thereunder.  Thus, this Court will review the Trustees' decision using the "arbitrary and capricious" standard.  However, the

parties disagree as to how that review should be "shaped," as they disagree on whether the Trustees operated under a conflict of interest.

      **B.    CONFLICT OF INTEREST**

Burick presents three arguments in support of his position that the Trustees operated under a conflict of interest.

First, Burick points out that employers contribute money to the Plan, and that some Trustees are appointed by contributing employers. Contending that "[p]resumably, funding shortfalls would be the responsibility of the contributing employers, from whom employer trustees are selected,"[2] Burick argues that a conflict of interest exists under the holding of Pinto, 214 F.3d at 393.

Pinto itself stands for the proposition that a heightened "arbitrary and capricious" standard of review applies where an insurance company administers an ERISA plan on behalf of an employer and pays benefits out of its own funds. See id. at 387. Thus, under Pinto, a conflict of interest may exist where a benefits decision has a direct financial impact on the plan administrator. Here, there is no evidence that a decision to grant or deny benefits would have a direct financial impact on

---

    [2] Although Burick characterizes the Trustees as having been selected "from" contributing employers, the record indicates only that some Trustees were appointed by contributing employers. Thus, there is no evidence that any contributing employers personally serve as Trustees.

either the Trustees or the contributing employers who appoint them.  Compare Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 45 n.5 (3d Cir. 1993) (finding no financial conflict of interest where employer's contributions to plan were fixed and plan language provided that contributed money could never be returned to employer), and Kotrosits, 970 F.2d at 1173 (finding no financial conflict of interest where employer-administrator had a duty to maintain the actuarial soundness of a defined benefit plan), with Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan, 298 F.3d 191, 198 (3d Cir. 2002) (finding financial conflict of interest where employer-administrator would be directly liable for $22,522.78 deductible if claim were paid), and Bruch v. Firestone Tire & Rubber Co., 828 F.2d 134, 137-38 (3d Cir. 1987) (suggesting that a conflict of interest exists where (1) an employer administers a plan and (2) benefits come directly from the employer's assets or the employer's yearly contributions are determined by benefits paid by the plan in the previous year), rev'd in part on other grounds, 489 U.S. 101 (1989).  Without such evidence, a heightened standard of review based on the financial relationship between the Plan and its contributing employers is inappropriate.  See Kosiba v. Merck & Co., 384 F.3d 58, 66-67 (3d Cir. 2004) (finding no conflict where plaintiff had "not excluded the possibility that [her employer] pays for the benefits it

10

administers through fixed contributions to an actuarially grounded fund").

Because there is no evidence on the record before this Court that benefits decisions have a direct financial impact on the Trustees or contributing employers,[3] Burick's first argument cannot succeed unless a conflict of interest exists any time employers who contribute to a pension plan appoint some of the plan's administrators.  In Pinto, however, the Third Circuit observed that—under its previous holdings—such an arrangement, in itself, does not "typically constitute the kind of conflict of interest mentioned in Firestone."  See Pinto, 214 F.3d at 383, 386.  Therefore, Burick's first argument is unpersuasive.

Second, Burick points out that he "is far removed from covered employment, having last so worked in 1993."  Burick argues there is thus "no incentive for the Trustees to be concerned" about him or about current employees' perception of his treatment, and that a conflict of interest therefore exists under Kosiba and Smathers.  However, neither Kosiba nor Smathers stands for the proposition that a plan participant's status as a former employee, standing alone, creates a conflict of interest.

---

[3] In their reply brief, Defendants argue that Burick's contention that employers would "presumably" be responsible for financial shortfalls is factually incorrect: "In the instant matter, the Plan is actuarially grounded with various employers, and other contributing members, making defined contributions to the Plan."  (Defs.' Reply at 4.)  However, Defendants provide no citation to the record in support of their argument.

Rather, they explain that a plan participant's status as a current employee may mitigate the conflict of interest created when an employer-administrator must pay claims out of its own funds.  See Kosiba, 384 F.3d at 65 ("When a former employee seeks benefits, this conflict-mitigating concern is not present."); Smathers, 298 F.3d at 198 ("Since Smathers was no longer an employee when Multi-Tool made its decision to deny his claims, the counterbalancing of its monetary self-interest by possible concerns about the impact of its decision on morale and wage demands would thereby be lessened.").

As explained supra, there is no evidence that the Trustees or the contributing employers who appoint them suffer direct financial harm upon the payment of claims.  Without such evidence, Burick's status as a former employee does not create a conflict of interest.  Therefore, Burick's second argument is unpersuasive.

Third, Burick contends that the Trustees' observation in their August 28, 2003 decision letter that he "ha[d] not submitted a proper application for Disability Pension to the Trustees to date" demonstrates procedural irregularity in the Trustees' decisionmaking process.  Citing Kosiba, Burick argues that this "irregularity" demonstrates a conflict of interest.

In Kosiba, the Third Circuit described the facts that led to a finding of procedural bias in that case:

> We have a claimant seeking continued LTD benefits whose treating physicians offer unequivocal support for her claims, and a plan administrator that has delegated claims administration to a large insurance company intervening——not at the initial determination stage, but at the appeal stage——with a request for an additional medical examination to be performed by a physician of its own choosing.  This situation arguably has a quality to it that undermines the administrator's claim to the deference normally owed to plan fiduciaries.  Given how favorable the record was to [the claimant] prior to [the additional physician's] examination, the most natural inference is that by intervening and ordering the retention of [the additional physician], thus seeking evidence to counter [the plaintiff's] physicians' evaluation, [the administrator] was not being a disinterested fiduciary.

Kosiba, 384 F.3d at 67 (observing that denial of benefits was grounded on additional physician's report).  Thus, the procedural irregularity in Kosiba both (1) led to a natural inference that the administrator was not acting as a disinterested fiduciary and (2) impacted the administrator's decision.  Here, the Trustees pointed out that Burick had not yet submitted a "proper" written application for benefits, an observation that was——by all appearances——correct.  Burick's brief does not explain how a "natural inference" from this observation is that the Trustees were not disinterested in the outcome of his case.  Moreover, there is no indication that the outcome of Burick's case would have been different had he submitted a formal, written

application.[4]  Therefore, the present case is distinguishable from Kosiba, and Burick's third argument is unpersuasive.

Because Burick has not demonstrated that the Trustees were operating under a conflict of interest when they denied his claim for benefits, this Court will review the Trustees' decision under the non-heightened arbitrary and capricious standard.

### C. ARBITRARY AND CAPRICIOUS REVIEW

#### 1. 2001 Plan

In order to be entitled to disability benefits under the 2001 Plan, a participant must have been "recently active in covered employment" at the date his disability started.  To be "recently active in covered employment," a participant must have "earned at least one-quarter of a year of Pension Service" "during the Plan Year in which [he] became disabled or in the immediately preceding Plan Year."

The Trustees found that Burick did not "become disabled" under the meaning of the 2001 Plan until August 19,

---

[4] Relying on Skretvedt, 268 F.3d at 178 (citing Univ. Hosps. of Cleveland v. Emerson Elec. Co., 202 F.3d 839 (6th Cir. 2000)), Burick contends that "[s]ince the purported lack of an application was noted in the denial, it was obviously a consideration for the Trustees."  (Pl.'s Opp. at 7 n.2.)  However, Skretvedt and University Hospitals identified "policy concerns" in deferring to "post hoc rationales for denying benefits claims generated for the purpose of litigation by ERISA plan administrators when those rationales did not appear in the denial letters sent to the benefits claimants or in the administrative record."  Skretvedt, 268 F.3d at 178 n.8.  Neither case stands for the proposition that every fact identified in an administrator's decision is outcome-determinative.

1998, when he was first entitled to receive Social Security benefits.  (Moskovitz Cert. Ex. D-12 at 00119.)  Burick argues that he became disabled when he was injured in August 1993.  (Pl.'s Opp. at 12.)

Because the 2001 Plan provides that a participant is "disabled" when he is entitled to receive Social Security benefits and does not work, this Court cannot find that the Trustees' decision that Burick became disabled on August 19, 1998 was without reason, unsupported by substantial evidence, or erroneous as a matter of law.  Because the Trustees' decision was therefore not arbitrary and capricious, see Skretvedt, 268 F.3d at 174, the Trustees' decision will be upheld as it regards Burick's right to disability benefits under the 2001 Plan.

### 2. **1995 Plan**

In order to be entitled to disability benefits under the 1995 Plan, a participant must be "totally disabled" and have "[ceased] . . . employment because of such total disability."  The Trustees found that Burick ceased employment in 1993, but did not become totally disabled until August 19, 1998.  Therefore, the Trustees concluded, Burick's employment did not cease because of his total disability, and he was not entitled to disability benefits under the 1995 Plan.  (See Moskovitz Cert. Ex. D-12 at 00118.)

Burick contends that the Trustees interpreted

15

"employment" in the relevant section of the 1995 Plan to mean "covered employment." Arguing that "[t]here is no requirement in the Plan language that the employment immediately preceding the onset of the total disability be limited to 'covered' employment," Burick contends that "[f]or the defendant[s] now to impose such a limiting condition contrary to the Plan language is arbitrary and without justification." (Pl.'s Opp. at 10-11.)

However, the Trustees' decision did not expressly limit "employment" to mean only "covered employment." Rather, it observed only that Burick's "employment ceased in 1993" and that Burick "ceased working in 1993." (See Moskovitz Cert. Ex. D-12 at 00118, 00119.) Burick has provided no evidence that the record before the Trustees indicated that he was employed in any capacity after 1993. Without such evidence, and because this Court's review of the Trustees' decision is limited to the record before the Trustees when their decision was made, see Mitchell, 113 F.3d at 440, this Court cannot infer that the Trustees interpreted "employment" to mean only "covered employment." Thus, even if such a limited interpretation would have been arbitrary and capricious, Burick has provided no evidence that it occurred. Therefore, the Trustees' decision regarding Burick's rights under the 1995 plan must be upheld.

**D.    BREACH OF FIDUCIARY DUTY**

Because there will be no money judgment against the

16

Plan, this Court need not address whether the Trustees would be individually liable for such judgment under 29 U.S.C. sections 1132(d)(2) and 1104(a)(1)(B).

**III.** **CONCLUSION**

For the reasons expressed in this Opinion, Defendants' motion for summary judgment will be granted.  The accompanying Order shall issue today.


Dated:    August 5, 2005            /s/ Robert B. Kugler
                                ROBERT B. KUGLER
                                United States District Judge